UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| Tracy R. Hughes, | ) | Civil Action No. 5:21-905-KDW |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | ORDER |
| Kilolo Kijakazi,[1] Acting Commissioner | ) | |
| of Social Security Administration, | ) | |
| | ) | |
| | ) | |
| Defendant. | | |

This social security matter is before the court pursuant to 28 U.S.C. § 636(c) and Local Civil

Rule 83.VII.02 (D.S.C.) for final adjudication, with the consent of the parties, of Plaintiff's petition

for judicial review. Plaintiff brought this action pursuant to 42 U.S.C. § 405(g) to obtain judicial

review of a final decision the Commissioner of Social Security ("Commissioner"), denying her claim

for Supplemental Security Income ("SSI") pursuant to the Social Security Act ("the Act"). Having

carefully considered the parties' submissions and the applicable law, the court affirms the

Commissioner's decision.

I.      Relevant Background

        A.      Procedural History

        On August 28, 2019, Plaintiff protectively filed for SSI, alleging she became disabled on

January 1, 2016. Tr. 207-08.[2] After being denied initially, Tr. 145, and upon reconsideration, Tr. 150,

Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"), Tr. 154. The ALJ

conducted a hearing on October 19, 2020. Tr. 41-84. The ALJ denied Plaintiff's claim in a decision

dated October 22, 2020. Tr. 21-40. Plaintiff requested review of this decision from the Appeals

---

[1] Kilolo Kijakazi became the Acting Commissioner of Social Security on July 9, 2021. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, the court substitutes Kilolo Kijakazi for Andrew Saul as Defendant in this action.
[2] Plaintiff's application is dated September 16, 2019, but her protective filing date is August 19, 2019. Tr. 24, 210-16, 277.

Council. Tr. 204-06. On May 15, 2020, the Appeals Council denied the request, Tr. 1-6, making the ALJ's October 22, 2020 decision the Commissioner's final decision for purposes of judicial review. Plaintiff brought this action seeking judicial review of the Commissioner's decision in a Complaint filed March 29, 2021. ECF No. 1.

B.     Plaintiff's Background

Born April 2, 1968, Plaintiff was 51 when she filed her application and 52 at the time of the ALJ's decision. Tr. 231. In her September 16, 2019 Disability Report-Adult form, Plaintiff indicated she had completed the 9th grade and attended special education classes. She did not complete specialized training. Tr. 227. Plaintiff indicated she worked as housekeeper/baby sitter from January 2009 through April 2012. Tr. 228. Plaintiff listed her medical conditions as back problem, hand/wrist/arm problem, knee problem, hip problem, migraines, diabetes, high cholesterol, thyroid disorder, high blood pressure, and Lyme disease. Tr. 226. Plaintiff indicated that she stopped working on April 10, 2012 because of other reasons; she believed her conditions became severe enough to keep her from working by January 1, 2016. Tr. 227.  Plaintiff indicated she was 5'3" tall, weighed 173 pounds, and her conditions caused her pain or other symptoms. Tr. 226.

In a Disability Report-Appeal dated January 24, 2020, Plaintiff indicated a change in her medical condition that occurred in December 2019. Plaintiff stated that her legs were very swollen and elevating them did not alleviate the swelling. Tr. 250. In another Disability Report-Appeal dated May 13, 2020, Plaintiff reported another change: as of approximately February 2020, Plaintiff indicated her "conditions have worsened especially the pain in hands." Tr. 259. Plaintiff also stated she had a "new" condition in that her swelling in her legs had worsened as of February 20, 2020. Tr. 259.

C.     Administrative Proceedings

On October 19, 2020, Plaintiff appeared with counsel at an administrative hearing and testified regarding her application for SSI. Vocational Expert ("VE") Karl Weldon also testified. Tr. 42. Because of the extraordinary circumstance presented by the COVID-19 Pandemic, the hearing was conducted by telephone. Tr. 24, 44-45. The ALJ and Plaintiff's counsel discussed the available exhibits; Plaintiff's counsel indicated the only remaining records to be obtained were notes from recent treatment by Calhoun Falls Family Practice. Tr. 45. Otherwise, it was agreed nothing was missing from the record and there was no reason to hold the matter over. Tr. 45-46.

    1. Plaintiff's Testimony

In response to questions from the ALJ Plaintiff indicated she was 52 years old, 5'2 ½" inches tall, weighed 238 pounds, and was right-handed. Tr. 47. Plaintiff said she was twice-divorced, not married at the time of the hearing, and has three adult children. Tr. 47. Plaintiff said she stayed with a friend of hers during the day and slept in a camper owned by that same friend at night. Tr. 47, 49. Plaintiff said she had to climb six steps to enter the house and had a two-and-a-half foot step up to enter the camper. Tr. 48. She said the camper step-up "almost kills [her]." Tr. 48. Plaintiff indicated she received food stamps and collected cans to earn money for medicine and things like that. Tr. 48-49. Plaintiff said she had never received workers' compensation or unemployment benefits. Tr. 49. She said she had no health insurance and was seen at Calhoun Falls, which has her on a sliding scale for payment. Tr. 49. Plaintiff said she had completed the ninth grade in school and "had to go to Christian school[.]" Tr. 50. Plaintiff said she had not yet obtained her GED. She had tried once but had a car accident and did not complete the process. She said she intended to try again. Tr. 50.

Plaintiff said that, other than picking up cans, she had not worked since 2011-2012. Tr. 50-51. Plaintiff indicated she had been self-employed as a babysitter and house-cleaner. Tr. 51. Plaintiff explained she had worked six days per week from 7:00 am until 6:00 pm. She said the family for which she worked had 14 children. Tr. 51-52. That job ended when the mother of the children became

ill and moved out of state. Tr. 53. Just before they moved Plaintiff said she had fallen 12 feet off of a porch and into a pool. Tr. 53.

Plaintiff said she had tried to wash dishes at the home where she currently stayed but broke the dishes because she was unable to hold things properly. Tr. 53-54. She said she had switched to using paper or plastic dishes. Tr. 54. Plaintiff said she helped her friend with the friend's several dogs and did some of the cooking. Tr. 54. She said she washed her own clothes. Tr. 54. She said she tried to help with cleaning such as vacuuming, sweeping, and cleaning bathrooms but she had to stop every ten minutes when vacuuming. Tr. 55. Plaintiff said she would sometimes go to the grocery store and had to lean on the buggy as if it were a walker. Tr. 55. Plaintiff indicated she had swollen ankles and the doctor had prescribed Lasix for it. She said that was not really helping. Tr. 55. Plaintiff said she mainly spoke with family on the phone rather than visiting with them. Tr. 56. She said that, before the COVID pandemic she had attended church, but she was not doing so at the time because of COVID. Tr. 56. Plaintiff said she and her friend watched a lot of soap operas on television during the day and she played on the computer some. Tr. 56. Plaintiff said she would have to get up because her back would hurt "real bad where [she] almost [got] sick." Tr. 56. Plaintiff said she did not do any yardwork because her friend's husband did it. Tr. 56-57.

Plaintiff said she used to have a driver's license but it had expired and she had not renewed it because of money issues. Tr. 58-59. When asked if she had any hobbies besides computer games, Plaintiff said she would do crafts to make bracelets, necklaces, and bookmarks if her hands were not hurting. Tr. 59. Plaintiff said she tried to walk some for exercise but would have to stop and catch her breath after five minutes. Tr. 59. Plaintiff said she could take care of her own personal hygiene. Tr. 59. She said she smoked six cigarettes a day and did not drink alcohol or use street drugs. Tr. 59-60. Plaintiff said that, in the past, she had been addicted to medication that had been prescribed after a surgery. Tr. 59-60.

The ALJ asked Plaintiff to describe the most severe impairment she had that she believed kept her from doing any type of work. Plaintiff responded it was her hands and back. Regarding her hands, Plaintiff said she is unable to hold things. Tr. 60. She indicated a doctor had "blamed it on the Lyme disease." Tr. 60. Plaintiff said she had been admitted to AnMed hospital for Lyme disease approximately seven years ago. Tr. 60-61. The doctor had indicated she would likely have arthritis within five years. Tr. 60. Regarding her back, Plaintiff indicated she had experienced back trouble since her fall in 2012. Tr. 62. Plaintiff said her back trouble and arthritis had gotten worse in the past few years. Tr. 62, 65. She said her back hurt so bad in the morning she had to pull herself out of bed. She said if she bent down too long she required help to get up. Tr. 62. Plaintiff said she was taking ibuprofen twice a day for the arthritis. Tr. 62. Plaintiff said she had been bothered by arthritis for about three years. Tr. 64. Plaintiff said she was told her back problems were "part of the arthritis." Tr. 64. She indicated she had not had MRIs or x-rays,[3] nor had she been advised she needed surgery. Tr. 64-65. Plaintiff said she took Topamax for headaches. Tr. 62-63. Plaintiff also indicated she took Buspar, Prozac, Synthroid, and trazadone. Tr. 63-64. The ALJ noted Plaintiff's depression and anxiety. The ALJ asked Plaintiff whether she had been diagnosed with fibromyalgia by Dr. Auga (phonetic). Tr. 65. Plaintiff's response was, "All I know is that she—the doctor gave me notice for the pain in my legs, my back, my hands." Tr. 65.[4]

The ALJ asked about other physical problems. Plaintiff said she could not walk for more than five minutes without having to stop and catch her breath. She said she was diagnosed with exercise-induced asthma and was prescribed an inhaler. Tr. 65. Plaintiff again noted she had swollen ankles; she indicated that had begun at the start of the year. Tr. 66. Plaintiff said she had migraine headaches

---

[3] The record includes an x-ray of Plaintiff's lumbar spine. Tr. 344.
[4] This is an apparent reference to Plaintiff's consultative examination by Amir M. Agha, M.D., a rheumatologist. Tr. 333. The court notes, however, that Dr. Agha is a male, making it unclear whether Plaintiff's answer was responsive to the ALJ's question.

that were bad enough to make her sick. She said she had them two-to-three times a week and, without medication, they lasted more than five hours. With the medication, they lasted two-to-three hours. Tr. 66.

When asked about side effects from her medications, Plaintiff noted she had some bruising, and one medication caused constipation and the rest caused diarrhea. Tr. 67.

Regarding any psychological problems she believed would keep her from working, Plaintiff said she sometimes "out of nowhere" would start crying for two-to-four hours. Tr. 67-68. She said the crying was not as bad now that she was taking Prozac but that it still happened some, just not as often. Tr. 68. Plaintiff said she was unable to afford to see a counselor or therapist. Tr. 68.

Plaintiff said she could sit for 15-to-20 minutes before needing to stand up. Tr. 68. She said she could stand for 20 minutes if she leaned against the sink. Tr. 68. Plaintiff said she would go to the grocery store for more than an hour at a time but would be leaning on the buggy. Tr. 68-69. Plaintiff said the heaviest thing she would pick up was a three-pound bag of cat food. She did not lift a gallon of anything. Tr. 69. Plaintiff said it hurt when she bent over to pick something up. Tr. 69. She said stairs hurt her knees, and her left one was worse since she had taken a fall a couple of weeks prior. Tr. 69. Plaintiff said she told her doctor about this and was advised there was nothing to do about it because she was walking on it. Tr. 70.

In response to questions from counsel, Plaintiff indicated she did not receive a lot of treatment because she could not afford it. Tr. 70. Plaintiff said she had been advised to take ibuprofen for her hands. Tr. 70. She noted her swelling in her ankles had been there for several years but has gotten worse. Tr. 70-71. Plaintiff said she felt like she was on pins and needles. Tr. 71. Plaintiff said she often sat with her feet elevated. Tr. 72-73. Plaintiff's counsel noted Plaintiff had been using a cane when she saw Dr. Auga [Agha] in November of 2019. Plaintiff explained that she used a cane when it got to the point that she could barely walk, usually when a storm was coming. Tr. 73.

Plaintiff clarified that, if standing without support she could stand for "just a few minutes" without having to walk around. Tr. 75. Plaintiff said that had gotten worse and that the prior October and into the holidays she had been able to stand for half an hour to 45 minutes before needing to sit down. Tr. 76.

2. VE's Testimony

VE Weldon testified that Plaintiff's past relevant work ("PRW") would be described as a "domestic sitter" under the Dictionary of Occupational Titles ("DOT"). It was of medium exertion with an SVP of 3 and a DOT number of 301.677-010. Tr. 77-78. The ALJ then asked the VE to assume a hypothetical individual of the same education and other abilities who could perform light work, lifting and carrying ten pounds frequently and up to 20 pounds occasionally. Tr. 78. In addition, for hypothetical number one, the ALJ indicated the following:

> Let's go with occasional climbing ladders (INAUDIBLE) two step thing. So, occasional on that. Frequent on climbing ramps and stairs. Frequent on stooping, kneeling, crouching, and crawling. Frequent, not continuous handling. Avoid concentrated exposure to hazards associated with dangerous machinery or unprotected heights.
> And there's not really here (PHONETIC) a lot, but Claimant is capable or able to understand, remember, and carry out simple, routine tasks and instructions in a low stress environment defined as being free of fast paced or team dependent production requirements.
> Maintain concentration, persistence, and pace for at least a two hour period. And completes task with uninvolved (PHONETIC) written or oral instructions with few concrete variables or from standardized situations.
> And Claimant should be—should have only occasional interaction with the general public and frequent interaction with coworkers.

Tr. 78-79. The ALJ asked whether this hypothetical individual could perform Plaintiff's PRW, and the VE indicated she would not. Tr. 79. The VE testified there would be work such an individual with these limitations could perform, identifying the following examples of work that could be performed at the light, unskilled level: garment sorter, DOT code 222.687-014, 217,000 jobs in the national economy; marker, pricer, DOT code 209.587-034, 1,800,000 jobs in the national economy. Tr. 80-81. Each of these is at the light exertion level with an SVP of 2. Tr. 81. The VE continued, identifying

an additional available job for the hypothetical individual: cleaner/housekeeper, DOT number 323.687-014, 915,000 jobs in the national economy. Tr. 80.

The ALJ noted these jobs would be examples and there would be other available jobs as well. Tr. 80. The ALJ asked the VE whether there was anything not covered by the DOT that needed to be addressed. Tr. 81. The VE responded that he was familiar with these jobs and they would be consistent with the DOT and outside the DOT would be covered by the VE's professional experience. Tr. 81.

Plaintiff's counsel then asked whether, using the ALJ's hypothetical but adding that the individual would need to elevate her feet eight-to-ten inches off the floor at the workstation, the individual could perform the jobs indicated. Tr. 81. The VE initially indicated that the individual could still perform the indicated jobs if elevating feet eight-to-ten inches. If the elevation needed to be up to chair-height, there would be no work. Tr. 81. However, after clarification of the question as being whether there would be light jobs for a person who needed to elevate eight-to-ten inches while at the workstation, the VE testified there would be no *light* jobs. Tr. 82. The VE indicated there would be sedentary work if the individual had to elevate eight-to-ten inches while at the workstation but not if the elevation requirement were to chair height. Tr. 82. Plaintiff's counsel asked if there would be work if the hypothetical individual was going to miss two days of work out of the month because of headaches or would be off-task 15 percent of the workday because of headache. Tr. 83. The VE testified either of these impairments—off-task for 15% of the workday or absent for two days per month—would preclude all work activity. Tr. 83.

The hearing was then closed. Tr. 83-84.

II.    Discussion

A.    The ALJ's Findings

In her October 27, 2020 decision, the ALJ made the following findings of fact and conclusions of law:

1.      The claimant has not engaged in substantial gainful activity since August 28, 2019, the application date (20 CFR 416.971 *et seq.*).

2.      The claimant has the following severe impairments: degenerative disc disease of the spine, obesity, depression, anxiety, and neurodevelopmental disorder (20 CFR 416.920(c)).

3.      The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).

4.      After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 416.967(b) except she is limited to occasional climbing of ladders, ropes, or scaffolds; frequent climbing of ramps and stairs; frequent stooping, kneeling, crouching, and crawling; and frequent, but not continuous handling. She must avoid concentrated exposure to hazards associated with dangerous machinery or unprotected heights. The claimant is able to understand, remember, and carry out simple, routine tasks, in a low stress environment (defined as being free of fast-paced or team-dependent production requirements), maintain concentration, persistence, and pace for at least 2 hour periods, and involving the application of common sense understanding to carry out and complete tasks with uninvolved written or oral instructions with few concrete variables in or from standardized situations. The claimant should have only occasional interaction with the general public and frequent interaction with coworkers.

5.      The claimant is unable to perform any past relevant work (20 CFR 416.965).

6.      The claimant was born on April 2, 1968, and was 51 years old, which is defined as an individual closely approaching advanced age, on the date the application was filed (20 CFR 416.963).

7.      The claimant has a limited education (20 CFR 416.964).

8.      Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

9.      Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969 and 416.969(a)).

> 10.    The claimant has not been under a disability, as defined in the Social Security Act, since August 28, 2019, the date the application was filed (20 CFR 404.920(g)).

Tr. 26-27, 29, 34-36.

B.    Legal Framework

1.    The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are "under a disability," defined as:

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]

42 U.S.C. § 423(d)(1)(A); *see also* 42 U.S.C. § 1382c(a)(3)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series of five sequential questions. *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983) (discussing considerations and noting "need for efficiency" in considering disability claims). An examiner must consider the following:  (1) whether the claimant is working; (2) whether the claimant has a severe impairment; (3) whether that impairment meets or equals an impairment included in the Listings;[5] (4) whether such impairment

---

[5] The Commissioner's regulations include an extensive list of impairments ("the Listings" or "Listed impairments") the Agency considers disabling without the need to assess whether there are any jobs a claimant could do. The Agency considers the listed impairments, found at 20 C.F.R. Part 404, Subpart P, Appendix 1, severe enough to prevent all gainful activity. 20 C.F.R. § 416.925. If the medical evidence shows a claimant meets or equals all criteria of any of the listed impairments for at least one year, he will be found disabled without further assessment. 20 C.F.R. § 416.920(a)(4)(iii). To meet or equal one of these Listings, the claimant must establish that his impairments match several specific criteria or be "at least equal in severity and duration to [those] criteria." 20 C.F.R. § 416.926; *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *see Bowen v. Yuckert*, 482 U.S. 137, 146 (1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3).

prevents claimant from performing PRW; and (5) whether the impairment prevents the claimant from performing specific jobs that exist in significant numbers in the national economy. *See* 20 C.F.R. § 416.920. These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis. If a decision regarding disability may be made at any step, no further inquiry is necessary. 20 C.F.R. § 416.920(a)(4) (providing that if Commissioner can find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step).

A claimant is not disabled within the meaning of the Act if he can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work. *See* 20 C.F.R. Subpart P, § 416.920(a), (b); Social Security Ruling ("SSR") 82-62 (1982). The claimant bears the burden of establishing his inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the regional economy. To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to PRW. *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). If the Commissioner satisfies that burden, the claimant must then establish that he is unable to perform other work. *Hall v. Harris*, 658 F.2d 260, 264–65 (4th Cir. 1981); *see generally Bowen*, 482 U.S. at 146. n.5 (regarding burdens of proof).

2.     The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner made after a hearing to which he was a party." 42 U.S.C. § 405(g). The scope of that federal court review is narrowly tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard

in evaluating the claimant's case. *See id.*, *Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls v. Barnhart*, 296 F.3d at 290 (citing *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence." *Vitek v. Finch*, 428 F.2d 1157, 1157–58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (citing *Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005); *see also Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (explaining that, "whatever the meaning of 'substantial' in other contexts, the threshold for such evidentiary sufficiency is not high," as it means only "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion"). Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings, and that the conclusion is rational. *See Vitek*, 428 F.2d at 1157–58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

III.    Analysis

Plaintiff argues that the ALJ's RFC is not supported by substantial evidence in several ways: (1) the ALJ failed to adequately develop the record as to Plaintiff's physical exertional impairments, improperly considering the opinion of a consulting examiner and substituting her own lay opinion as to Plaintiff's physical RFC; (2) the ALJ's RFC did not take into account Plaintiff's moderate limitations in concentration, persistence, and pace. Plaintiff also submits that the Commissioner's final decision denying benefits was constitutionally defective because of the "ALJ's willful reliance on an unconstitutional determination" in a prior proceeding. Pl. Br., ECF No. 17; *see also* Pl. Reply,

ECF No. 20. The Commissioner contends that substantial evidence supports the ALJ's decision finding that Plaintiff was not disabled and that Plaintiff has not set out a constitutional issue that would necessitate remand. Def. Br., ECF No. 19.

To consider Plaintiff's allegations of error related to the ALJ's RFC finding the court first sets out relevant related evidence.

A.  Medical evidence

In September 2013, several years prior to Plaintiff's alleged onset date of January 1, 2016, the Commissioner requested that Robin Moody, Ph.D. evaluate Plaintiff in connection with a prior disability application. Tr. 299-304. Dr. Moody examined Plaintiff, conducted several tests, and diagnosed her with borderline intellectual functioning. She also indicated major depressive disorder should be ruled out. Tr. 303. Dr. Moody opined Plaintiff's concentration, pace, and persistence were fair. She further found Plaintiff could follow a simple one or two step instruction but not more complex directions or instructions. Tr. 304.

Plaintiff's alleged onset date is January 1, 2016; however, the record includes no specific medical documents from 2016, 2017, or 2018.[6] Records from Calhoun Falls Family Practice indicate Plaintiff saw Jo Hammett, a family nurse practitioner, in August 2019. Tr. 317. Notes indicated Plaintiff was there for "follow up." Plaintiff reported to NP Hammett that she had not been seen by a doctor in at least four years and had not been on medication since 2016. Tr. 317. She reported some bilateral lower extremity edema that had worsened in the past three weeks. Tr. 317. Plaintiff indicated she smoked at least ½ of a pack of cigarettes per day and drank occasionally. Tr. 317. Plaintiff also

---

[6] The record includes an SSA-generated Health Information Technology ("HIT") Medical Report on Plaintiff that includes a "Problem List" showing various problems with a "First Date" in 2016. Tr. 345-48. These include chronic obstructive lung disease, dysuria, eczema, fatigue, hypercholesterolemia, hypothyroidism, insomnia, major depressive disorder, uncontrolled Type II diabetes. Other than "First Date" information, this record includes no detail regarding complaints, diagnoses, or treatments in 2016 through 2018. Tr. 345-48.

indicated she was not sleeping well, had some dizziness, and had a lot of family stressors. Tr. 318. Plaintiff's physical examination was normal except for edema (swelling) in her lower extremities. Tr. 319. NP Hammett indicated Plaintiff had a normal mood and affect, normal behavior, and normal judgment and thought-content. Tr. 319. NP Hammett prescribed furosemide (diuretic) for Plaintiff's edema and encouraged her to keep her legs elevated while at rest. Tr. 320. NP Hammett refilled a prescription for trazodone for Plaintiff's insomnia. She was prescribed Buspar for anxiety. Tr. 320.

Plaintiff returned to NP Hammett on September 19, 2019 and reported the Buspar was helping significantly with her anxiety and depression. Tr. 326. Plaintiff also reported some right back pain, for which NP Hammett recommended ibuprofen. Tr. 326-27. Plaintiff returned for follow up on December 20, 2019. Tr. 352. Plaintiff reported she had gained weight and tried to exercise by walking about ¼ mile per day. She said she needed to lie down after walking because her joints hurt. She also reported pain with urination, constipation, a dry cough with sinus drainage. Tr. 352. She was continued on medications, including ibuprofen for pain. Tr. 353.

X-ray imaging of Plaintiff's lumbar spine in November 2019 indicated "no acute lumbar spine findings." The impression indicated mild degenerative disc disease at L5-S1 and L4-5, and degenerative facet disease at L5-S1. Tr. 344.

Plaintiff returned to NP Hammett in March 2020, noting seasonal sinus drainage and a headache that had been waxing and waning for three weeks. She indicated she was taking ibuprofen for arthritis but it was not helping her headaches. Tr. 349. Prescriptions added included Prozac for depression and Topamax for headaches. Tr. 351.

Plaintiff returned to Calhoun Falls Family Practice in August 2020 with the chief complaint of depression. She saw William Stanley, PA. Tr. 373. Plaintiff indicated she believed Prozac was helping but possibly could be increased. Tr. 374. It was noted Plaintiff had chronic depression that had been aggravated by her uncle's passing. Tr. 374. Plaintiff's Prozac prescription was increased.

Counseling was discussed but Plaintiff indicated she did not have transportation to get to counseling. Tr. 377.

B.  Opinions since alleged onset date

In addition to the above-mentioned 2013 opinion from Dr. Moody the record includes several opinions rendered since Plaintiff's alleged onset date of January 1, 2016.

1.  Amir M. Agha, M.D., consulting rheumatologist

On November 6, 2019 Plaintiff was evaluated by Amir M. Agha, M.D., a rheumatologist, at the request of the Commissioner. Tr. 333. Dr. Agha found Plaintiff had a normal range of motion in her cervical spine, shoulders, elbows, wrists, knees, hips, and ankles. He was unable to assess Plaintiff's lumbar range of motion because she was in "too much pain" and was "reluctant to bend over." Tr. 334, 337. Dr. Agha indicated Plaintiff had normal grip strength and normal fine and gross manipulation abilities in both hands. Tr. 335. Plaintiff had an antalgic, unsteady gait and was unable to squat, heel walk, toe walk, or tandem walk. Tr. 335. Dr. Agha found Plaintiff's strength, reflexes, and peripheral pulses were with the normal range for both her upper and lower extremities. Tr. 335. He included a note that she had non-pitting edema, which is described as "+1 pedal edema." Tr. 335-36. Dr. Agha noted Plaintiff was in "moderate to severe pain, very anxious." Tr. 336. He noted Plaintiff had a crying spell during the examination. Tr. 336. Dr. Agha's "Plan" notes stated the following:

> Chronic pain generalized without any weakness. Exam without synovitis to suggest inflammatory arthropathy. Unable to evaluate range of motion of the spine (thoracolumbar) as she was in lot of pain and was reluctant to bend over. No weakness or atrophy on exam today. I feel she has some component of fibromyalgia. I have incorporated other pertinent finding with this letter.

Tr. 336-37.

2.  Rebecca L. Sorrow, PhD, consulting psychologist

On November 26, 2019, Rebecca L Sorrow, PhD examined Plaintiff at the request of the Commissioner. Tr. 338-42. Dr. Sorrow indicated she had reviewed Plaintiff's prior evaluation by Dr. Moody as well as her records from seeing NP Hammett on October 17, 2019. Tr. 339. Plaintiff noted she had received no mental health treatment but had been prescribed Buspar and trazodone by her family doctor. Tr. 340. She scored 28/30 on the Folstein Mini-Mental State Examination ("MMSE"). Tr. 340. Dr. Sorrow noted that Plaintiff demonstrated a nervous affect. She also found Plaintiff to be well-groomed, cooperative, with clear and unpressured speech, logical thought processes, no hallucinations, and no evidence of psychosis or delusions during the examination. Tr. 339-41. Plaintiff reported a depressed mood, especially around the holidays. Tr. 340. She also reported panic attacks, poor memory, and issues with attention and concentration. Tr. 340. Plaintiff reported that she did her own housekeeping, cooking and grocery shopping, handled her own finances, used a cell phone and computer for the internet and Facebook, and engaged in self-care. Tr. 341. She noted she had had a driver's license but had let it expire. Tr. 341. Plaintiff reported that she got along well with people and liked to get together with friends. Tr. 341. Plaintiff said she used to attend church. Tr. 241.

Dr. Sorrow noted Plaintiff's prior testing that indicated borderline intellectual functioning. Tr. 342. She also noted Plaintiff had completed the 9th grade but had not obtained a GED. Tr. 342. Based on Plaintiff's 28/30 MMSE score, her behavior during the examination, and her functional assessment, Dr. Sorrow opined Plaintiff was "probably capable of the concentration and focus [] needed to perform simple tasks and follow basic instructions." Tr. 342. Dr. Sorrow continued, "[Plaintiff's] mild depression and her limited abilities may interfere with her ability to perform more complex tasks in stressful situations and may also interfere with her ability to interact with the public and to adapt to change." Tr. 342.

    3.  State agency experts

        a.  Psychologists Silvie Ward, Ph.D. and Craig Horn, Ph.D.

In December 2019, Silvie Ward, Ph.D., a state agency psychologist, reviewed Plaintiff's medical records and completed a Psychiatric Review Technique form. Tr. 112-13. Dr. Ward concluded that Plaintiff had moderate difficulties using, remembering, or applying information; moderate difficulties interacting with others; moderate difficulties concentrating, persisting, or maintaining pace; and mild difficulties adapting or managing herself. Tr. 112-13. Dr. Ward also completed a mental RFC assessment and concluded that Plaintiff was able to understand and remember simple instructions, but could not remember detailed instructions; she was able to attend to and perform simple, unskilled tasks and maintain concentration and attention for periods of at least two hours; respond appropriately to supervision, co-workers, and usual work situations; be aware of normal hazards and take precautions, use judgment to make simple work-related decisions, and respond appropriately to changes in a routine work setting Tr. 116-118. Dr. Ward opined, however, that Plaintiff would perform best in settings that do not require on-going public interaction. Tr. 118. In April 2020, Craig Horn, Ph.D., another state agency psychologist, reviewed Plaintiff's updated medical records and agreed with Dr. Ward's assessment. Tr. 129-30, 134-36.

      b. Physicians Kimberly Patton, M.D. and Dina Nabors, M.D.

In January 2020, Kimberley Patton, M.D., a state agency physician, reviewed Plaintiff's medical records and completed a physical RFC assessment. Tr. 114-16. Dr. Patton concluded that Plaintiff could perform medium work with occasional climbing of ladders, ropes, or scaffolds and frequent climbing of ramps and stairs, stooping, kneeling, crouching, and crawling. Tr. 115-16. In April 2020, Dina Nabors, M.D., another state agency physician, reviewed Plaintiff's updated medical records and agreed with Dr. Patton's assessment. Tr. 132-34.

C. The ALJ's consideration of record opinions

For benefits applications filed on or after March 27, 2017 (such as Plaintiff's), the SSA has enacted substantial revisions to the regulations governing the evaluation of opinion evidence. *See*

Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5844-01, 2017 WL 168819 (Jan. 18, 2017). Under these regulations, ALJs need not assign an evidentiary weight to medical opinions or give special deference to treating source opinions. 20 C.F.R. § 416.920c(a) (providing that ALJs "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [a claimant's] medical sources").[7] Instead, ALJs consider medical opinions using five factors: (1) supportability; (2) consistency; (3) the medical source's relationship with the claimant; (4) the medical source's specialization; and (5) other factors, such as the medical source's familiarity with the other evidence in the claim or understanding of the disability program's policies and evidentiary requirements. 20 C.F.R. § 416.920c(c). The first two factors, supportability and consistency, are the most important in determining the persuasiveness of a medical source's opinion, and the ALJ is not required to explain the consideration of the other three factors. *Id.* § 416.920c(b)(2). The new regulations further deem certain evidence "inherently neither valuable nor persuasive." 20 C.F.R. § 416.920b(c). This includes statements on issues reserved to the Commissioner such as whether a claimant is disabled, is unable to work, or is incapable of doing past relevant work. 20 C.F.R. § 416.920b(c)(3).

Here, after setting out information regarding the medical record and her findings as to Plaintiff's RFC, the ALJ considered the medical opinions as follows, Tr. 33-34:

- State agency medical consultants: The ALJ found the opinions of the state agency medical consultants were not fully persuasive. Tr. 33. In particular, the ALJ found the opinion that

---

[7] The new regulations define a "medical opinion" as "a statement from a medical source about what you can still do despite your impairment(s) and whether you have one or more impairment-related limitations or restrictions" in the abilities to perform the physical, mental, or other demands of work activity or to adapt to environmental conditions. 20 C.F.R. § 416.913(a)(2). Those regulations also define a "prior administrative medical finding" as a "finding, other than the ultimate determination about whether [a claimant is] disabled, about a medical issue made by [the SSA's] Federal and State agency medical and psychological consultants at a prior level of review." 20 C.F.R. § 416.913(a)(5).

Plaintiff had the severe impairment of fibromyalgia was "not fully supported by or consistent with the longitudinal record," noting there had only been a speculative finding of fibromyalgia by a consultative examiner and there had been "no findings on physical examination to support such a diagnosis, such as tender points." Tr. 33 (citing Exhibit C4F/4). The ALJ also found the consultants' opinion that Plaintiff would be limited to work at the medium exertional level was not fully supported by or consistent with the longitudinal record, finding the "combined effect of the claimant's back impairment and obesity support a limitation to a range of light work." Tr. 33.

- State agency psychological consultants: The ALJ found these experts' determination that Plaintiff's severe mental impairments resulted in "moderate limitations in understanding, remembering, or applying information, interacting with others, and concentrating, persisting, or maintaining pace" is supported by and consistent with the longitudinal record. Tr. 33. Specifically, the ALJ noted reported test results indicating Plaintiff had cognitive functions ranging from below average to deficient. Tr. 33 (citing Exhibits C1F, C5F). The ALJ further noted, however, that Plaintiff had not received specialized treatment for her mental impairments and that her anxiety and depression symptoms had stabilized with conservative treatment by her family doctor. Tr. 33 (citing C3F/13).

- 2013 psychologist consultant, Dr. Robin Moody: The ALJ noted Dr. Moody's consultative examination had been performed and her opinion rendered in 2013, prior to the alleged onset date. Tr. 33. In any event, the ALJ found Dr. Moody's opinions that Plaintiff could perform simple one or two-step instructions but not more complex instructions were well-supported by the results of administered testing that showed Plaintiff was functioning in the borderline range. Tr. 33. The ALJ also noted Dr. Moody's opinion was generally consistent with the longitudinal record, particularly the later opinion of Dr. Sorrow.

19

- Psychologist consultant Dr. Sorrow: The ALJ found Dr. Sorrow's opinion to be persuasive as it was supported by and consistent with the totality of the evidence. Tr. 33. The ALJ noted Dr. Sorrow's opinion that Plaintiff could perform simple tasks and follow basic instructions but not more complex tasks in stressful situations or interact with the public was supported by mental status findings and was consistent with the longitudinal record, including Dr. Moody's opinion. Tr. 33.

- Rheumatology consultant Dr. Agha: The ALJ found Dr. Agha's examination to be "vague, in that it fails to set forth the claimant's limitations in function-by-function vocationally relevant terms." Tr. 33. In any event, the ALJ reviewed Dr. Agha's findings on physical examination and found they were not fully consistent with the longitudinal record. Tr. 33. "In particular, Dr. Agha's speculative statement that the claimant may have some component of fibromyalgia is not consistent with generally normal findings on physical examination in the longitudinal record, as well as no findings of tender points during her examination or elsewhere in the record." Tr. 33-34.

D. Allegation of error in assessing Plaintiff's physical RFC

Plaintiff argues the ALJ erred in evaluating the opinion evidence in that she did not sufficiently explain why Dr. Agha's findings were not properly considered; Plaintiff argues the ALJ should have further developed the record to gain more information from Dr. Agha regarding Plaintiff's lower-extremity impairments. Plaintiff explains that Dr. Agha was the only examining source who offered any opinion as to Plaintiff's exertional impairments and, as such, the ALJ should have obtained additional information from him rather than discounting his opinion as speculative. Plaintiff submits this error was compounded by the ALJ's finding the state agency consultants' opinions as to physical RFC were not found to be persuasive, thereby causing the ALJ to "play doctor" in determining Plaintiff's RFC. Pl. Mem. 9-14.

The Commissioner disagrees, arguing the ALJ's findings as to Plaintiff's physical RFC are supported by substantial evidence. Def. Mem. 14. The Commissioner notes Dr. Agha did not set forth any specific functional limitations. Further, the ALJ considered Dr. Agha's physical findings on examination and found they were not fully consistent with the longitudinal record that generally showed that Plaintiff had a normal gait and normal range of motion. Tr. 33; *see* Tr. 27 (ALJ's reviewing medical records and noting physical examination findings are "generally normal," citing various medical records; also noting Dr. Agha's positive findings but noting they were the only such findings in the record); *see, e.g*., Tr. 353 (Dec. 20, 2019 visit with NP Hammett indicating normal range of motion).

Contrary to Plaintiff's suggestion, the ALJ was in no manner required to order additional information from Dr. Agha. In fact, it is Plaintiff's duty to introduce evidence of impairments through the first four steps of the sequential process. *Pass v. Chater*, 65 F.3d 1200, 1203 (4th Cir. 1995); 20 C.F.R. § 416.912(a) ("you have to prove to us that you are blind or disabled"); 42 U.S.C. § 423(d)(5)(A) ("An individual shall not be considered to be under a disability unless he furnishes such medical and other evidence of the existence thereof as the Commissioner of Social Security may require."). That noted, however, an ALJ "has a duty to explore all relevant facts and inquire into the issues necessary for adequate development of the record, and cannot rely only on the evidence submitted by the claimant when that evidence is inadequate." *Cook v. Heckler*, 783 F.2d 1168, 1173 (4th Cir. 1986). "The key consideration is 'whether the record contained sufficient medical evidence for the ALJ to make an informed decision' regarding the claimant's impairment." *Lehman v. Astrue*, 931 F. Supp. 2d 682, 692–93 (D. Md. 2013) (quoting *Craft v. Apfel*, No. 97-2551, 1998 WL 702296 (4th Cir. 1998)). Notably, an "ALJ is under no obligation to supplement an adequate record to correct deficiencies in a plaintiff's case." *Lehman*, 931 F. Supp. 2d at 693. "A lack of opinion evidence from a treating physician does not . . . necessarily trigger a duty to develop the record[.]" *Id.* at 694. This

21

is particularly so when the claimant is represented by counsel. *See Hawkins v. Chater*, 113 F.3d 1162,

1167 (10th Cir. 1997) ("[W]hen the claimant is represented by counsel at the administrative hearing,

the ALJ should ordinarily be entitled to rely on the claimant's counsel to structure and present

claimant's case in a way that the claimant's claims are adequately explored."). Here, Plaintiff was

represented. At the hearing, her counsel indicated he did not believe the record needed to remain open

for any documents other than treatment notes from Calhoun Falls Family Practice. Tr. 45-46. Further,

the regulations provide that only if there is insufficient evidence to determine whether the claimant is

disabled, the ALJ has the discretion to "determine the best way to resolve the inconsistency or

insufficiency." *See* 20 C.F.R. § 416.920b(b)(2). The ALJ was not required to recontact consultative

examiner Dr. Agha to obtain additional information with respect to his opinion. Indeed, the ALJ had

enough information to determine that Plaintiff was not disabled, as she not only considered this

opinion, but prior administrative medical findings, Plaintiff's own statements regarding her functional

limitations, the objective medical evidence, Plaintiff's range of daily activities, and the medical

opinions of the other consultative examiners. Tr. 29-34.

To the extent Plaintiff is alleging error to the ALJ's discounting of Dr. Agha's speculation

that Plaintiff "has some component of fibromyalgia," Tr. 337, such allegation is in error. Although

Dr. Agha included the speculation as to some "component of fibromyalgia," nothing in his opinion

makes any mention of any "trigger points," which can provide evidence establishing of a fibromyalgia

diagnosis under the American College of Rheumatology Criteria (ACR) diagnostic criteria

enumerated in Social Security Ruling 12-2p. *See* 2012 WL 3104869, at *2–*3 (July 25, 2012). The

ALJ so noted in finding fibromyalgia to be a nonsevere impairment. Tr. 27 ("The consultative

examiner noted some suspected component of fibromyalgia in November 2019. However, the

longitudinal record does not show clinical findings which meet the American College of

Rheumatology criteria for fibromyalgia. For example, examinations do not show that she had at least

11 positive tender points on both sides of the body and above and below the waist."). Further, in her Disability Report, Plaintiff listed multiple physical and mental conditions she alleged limited her ability to work, but she did not allege that fibromyalgia was one such condition. Tr. 226. Plaintiff has not provided the requisite evidence to establish that she had a medically determinable impairment of fibromyalgia, nor was the ALJ required to seek out additional evidence under these facts.

Finally, contrary to Plaintiff's argument, the ALJ was not left to "play doctor" when she discounted Dr. Agha's speculative opinion. Plaintiff's focus in making this argument is on the fact that the ALJ partially discounted portions of the state agency medical consultants' opinions, including the findings that Plaintiff had the severe impairment of fibromyalgia and could work at the medium level of exertion. As discussed above, the ALJ did not err in discounting Dr. Agha's passing reference to a "suggestion of fibromyalgia." Further, in discounting the state agency experts' opinions that Plaintiff could perform work at the medium level of exertion, the ALJ found the longitudinal record did not support the medium level of exertion but that the record evidence, particularly Plaintiff's back impairment and obesity, supported a limitation to light work. Tr. 33. Particularly regarding Plaintiff's obesity, the ALJ noted Plaintiff had a Body Mass Index greater than 30 and stated, "[t]he evidence shows that the claimant's excess weight exacerbates her back and musculoskeletal pain, thereby limiting her ability to perform strenuous activities such as heavy lifting." Tr. 30. While Plaintiff characterizes the ALJ as having "rejected" the only opinion containing RFC findings, "leaving no opinion on which the ALJ might rely," Pl. Mem. 12, that is not the case. Rather, the ALJ considered the state agency experts' opinions and found them "not fully persuasive." Tr. 33. Notably, however, the ALJ found Plaintiff had a more, not less, restrictive RFC. The ALJ considered the record as a whole. She was not required to wholesale accept or reject any one expert's opinion. Thus, the ALJ did not evaluate the RFC on her own. Rather, the ALJ has shown that she "identif[ied] evidence that supports [her] conclusion and 'buil[t] an accurate and logical bridge from [that] evidence to [her]

conclusion.'" *Woods v. Berryhill*, 888 F.3d 686, 694 (4th Cir. 2018) (quoting *Monroe v. Colvin*, 826 F.3d 176, 189 (4th Cir. 2016)). The record contained sufficient evidence on which the ALJ could make a disability determination. Further or additional consideration of Dr. Agha's opinion was unnecessary. The ALJ considered the record as a whole in determining Plaintiff's physical RFC. Plaintiff's first allegation of error is dismissed.

E. Allegation of error in assessing Plaintiff's mental RFC

Plaintiff also alleges error as to the mental RFC the ALJ found her to have. Specifically, Plaintiff alleges the ALJ erroneously did not account for Dr. Sorrow's opinion regarding her ability to maintain attention, persistence, and pace, or Dr. Moody's 2013 opinion that Plaintiff would have a "fair at best" ability to make decisions. Pl. Mem. 14-20, Pl. Reply 3-6.

In considering her concentration, persistence, and pace, Dr. Sorrow opined that Plaintiff "was probably capable of the concentration and focus [] needed to perform simple tasks and follow basic instructions." Tr. 342. She further noted that Plaintiff may have difficulty performing more complex tasks in stressful situations and her "mild depression and limited abilities may interfere with her ability to perform more complex tasks in stressful situations and may also interfere with her ability to interact with the public and to adapt to change." Tr. 342.

As focused on by Plaintiff, Dr. Moody's description of Plaintiff's "Mental Status" indicated Plaintiff's "judgment and insight were fair, at best." Tr. 301. However, in providing her opinion for the "Clinical Functional Assessment" of Plaintiff's abilities, Dr. Moody did not specifically reference or propose limitations on Plaintiff's judgment-abilities.[8] Rather, she opined Plaintiff's "concentration, pace and persistence are fair as indicated by the WAIS-IV working memory score. Although she can

---

[8] In any event, as noted by the Commissioner, the jobs identified by the VE are all unskilled. Tr. 79-80. Unskilled work by regulatory definition is work that "needs little or no judgment to do simple duties that can be learned on the job in a short period of time." 20 C.F.R. § 416.968(a).

follow a simple one or two step instruction she is very distracted and is not able to follow more complex directions or instructions." Tr. 304.

In considering Step 3, the ALJ found Plaintiff had a moderate limitation in concentration, persistence, and pace, noting Plaintiff's mental status exam results and her activities of daily living ("ADLs"). Tr. 28. Relative to her mental RFC, the ALJ found the following:

> The claimant is able to understand, remember, and carry out simple, routine tasks, in a low stress environment (defined as being free of fast-paced or team-dependent production requirements), maintain concentration, persistence, and pace for at least 2 hour periods, and involving the application of common sense understanding to carry out and complete tasks with uninvolved written or oral instructions with few concrete variables in or from standardized situations. The claimant should have only occasional interaction with the general public and frequent interaction with coworkers.

Tr. 29.

The ALJ explained that she considered the longitudinal evidence of Plaintiff's mental health, including her moderate limitation in concentration, persistence, and pace. Tr. 32. The ALJ indicates these limitations support the RFC's limits, including the limitation to simple, routine tasks in a low-stress environment and the limitation to matters "involving the application of common sense understanding to carry out and complete tasks with uninvolved written or oral instructions with few concrete variables in or from standardized situations[.]" Tr. 32. The ALJ discusses the limitation of instructions with the ability to *complete* tasks—a hallmark of concentration, persistence, and pace. In addition, pace-based limitations are addressed in the RFC's requirement that Plaintiff work in an environment "free of fast-paced or team-dependent production requirements." Tr. 29. To the extent Plaintiff is arguing the ALJ's RFC that Plaintiff can concentrate, persist, and maintain pace for at least two hours at a time is somehow at odds with the opinions of Dr. Sorrow and Dr. Moody, Pl. Mem. 16, the court disagrees. Neither doctor opines that Plaintiff could maintain concentration, persistence, or pace for fewer than two hours. There is no harmful "failure to reconcile," as suggested by Plaintiff.

In fact, the ALJ's RFC virtually echoes Dr. Sorrow's opinion that Plaintiff likely had the "concentration and focus" required to perform "simple tasks" and to "follow basic instructions," but may be unable to perform more complex tasks in stressful situations. Tr. 342. *See Shinaberry v. Saul*, 952 F.3d 113, 121-22 (4th Cir. 2020) (affirming RFC relative to moderate limitations in concentration, persistence, and pace when the ALJ's "findings and the mental limitation included in the RFC [were] sufficiently explained and supported by substantial evidence in the record."); *cf. Mascio v. Colvin*, 780 F.3d 632 (4th Cir. 2015) (finding limitation to "simple, routine tasks or unskilled work," without more, did not adequately account for the finding of moderate limitations in concentration, persistence, and pace).

The ALJ adequately explained her reasons for the mental limitations she placed in Plaintiff's RFC. Her decision is supported by substantial evidence. This allegation of error is dismissed.

F.  Plaintiff's argument regarding alleged constitutional defect

Finally, Plaintiff argues remand is appropriate based on the ALJ's "willful reliance on an unconstitutional determination[,]" that is, the October 14, 2015 decision by ALJ Colin Fritz denying Plaintiff's prior SSI application. Pl. Mem. 18-19; *see* Tr. 89-102. In that prior decision, ALJ Fritz found Plaintiff had not been under a disability from February 16, 2012 through the October 14, 2015 date of the decision. Tr. 102. As required by Social Security Acquiescence Ruling 00-1(4) and *Albright v. Commissioner of the Social Security Administration*, 174 F.3d 473 (4th Cir. 1999), ALJ Jordan considered the findings of ALJ Fritz' prior decision. Tr. 34. ALJ Jordan cataloged the impairments as found by ALJ Fritz and noted his finding that Plaintiff could return to her PRW. Tr. 34. ALJ Jordan indicated she had given "some weight" to the findings in the prior decision in that she had found "several similar impairments." Tr. 34. She noted, though, that, in the application now being considered, she found Plaintiff's "back impairment supports the need for greater limitation." Tr. 34.

26

Plaintiff posits that ALJ Jordan's "willful reliance" on ALJ Fritz' prior decision requires remand because ALJ Fritz' 2015 decision was made unconstitutional by the June 2018 Supreme Court decision of *Lucia v. SEC*, 138 S. Ct. 2044 (2018). In *Lucia*, the Court held that SEC administrative law judges were "inferior officers" subject to the Appointments Clause of the United States Constitution and that a party "who makes a timely challenge to the constitutional validity of the appointment of an officer who adjudicates his case is entitled to relief." *Id.* at 2055 (citation omitted). On July 16, 2019, the then-Acting Commissioner ratified ALJ appointments. SSR 19-1(p), 2019 WL 13248666. Because ALJ Fritz issued the 2015 decision at a time he would have been considered to have been unconstitutionally appointed based on *Lucia*, Plaintiff submits it was reversible error for ALJ Jordan to afford weight to ALJ Fritz' decision, one ALJ Jordan was aware had been tainted by unconstitutional process. Pl. Mem. 19-20. Plaintiff seems to argue that the 2021 decision in *Carr v. Saul*, 141 S. Ct. 1352, 1356 (2021), which held that SSA claimants were not required to raise an Appointments Clause claim at the administrative level in order to preserve it for review in court, makes it appropriate for this court to now consider her *Lucia*-based challenge. Pl. Mem. 19-20.

The Commissioner disagrees. Def. Mem. 19-22. Defendant does not question whether ALJ Fritz was constitutionally appointed when he issued the 2015 decision. Rather, the Commissioner focuses on the finality of that decision, noting Plaintiff never appealed the October 14, 2015 ALJ decision, nor did she challenge the appointment of that ALJ at any time while that claim was pending. The time to appeal that decision has now passed, and the ALJ's decision is now final and binding. *See* 42 U.S.C. § 405(g) (allowing for appeals of final agency decisions within sixty days after the notice of the decision is mailed to a claimant); 20 C.F.R. § 416.1487 ("[I]f you are dissatisfied with a determination or decision made in the administrative review process, but do not request further review within the stated time period, you lose your right to further review and that determination or decision becomes final."); 20 C.F.R. § 416.1455(b) (ALJ's decision binding if Appeals Council denies review

and claimant does not seek judicial review). Defendant submits nothing in *Carr* or *Lucia* suggests Plaintiff could now somehow call into question the 2015 ALJ decision at this juncture. Defendant also focuses on the fact that the only decision before the court at this time is the 2020 decision by ALJ *Jordan*. Def. Mem. 20-22; *see id.* at 21 (noting Plaintiff's argument "amounts to an impermissible collateral attack on Plaintiff's October 14, 2015 decision, and *Lucia* does not support reaching back into the past to upend a long-final decision that is not properly before the Court.").

The court agrees with the Commissioner. Plaintiff's October 14, 2015 ALJ decision is not the subject of the instant appeal. Plaintiff in no way disputes the constitutionality of ALJ Jordan's appointment. Plaintiff cannot collaterally attack the 2015 ALJ decision at this point. *Accord Lisa W. v. Kijakazi*, No. 2:20-CV-00590, 2021 WL 6101825, at *11 (E.D. Va. Sept. 28, 2021) (recommending similar appellate ground be denied, finding *Carr* did not permit plaintiff to collaterally attack a prior, unappealed decision; further finding *Lucia* in no way prohibits ALJs from relying on prior ALJ decisions that had been rendered before the Acting Commissioner ratified all ALJ appointments on July 16, 2019), *report and recommendation adopted,* No. 2:20CV590, 2021 WL 5412585 (E.D. Va. Nov. 19, 2021); *see also Page v. Comm'r of Soc. Sec.*, No. 6:21-CV-258-LHP, 2022 WL 1619168, at *8 (M.D. Fla. May 23, 2022) (same). The application now under consideration was filed after ALJ appointments were ratified. *Lucia* does not require remand. This allegation of error is dismissed.

In any event, ALJ Jordan afforded only "some weight" to ALJ Fritz' prior decision. Tr. 34. ALJ Jordan imposed greater exertional limitations on Plaintiff than did ALJ Fritz and made substantially different findings. Tr. 34 (noting, for example, that ALJ Fritz had found Plaintiff could return to her PRW). Moreover, ALJ Jordan undertook a detailed review of Plaintiff's medical records, her testimony, and the opinions of several medical experts in making her decision as to the instant application for SSI. As discussed above, the court finds that substantial evidence supports ALJ

Jordan's decision. In so finding, there has been no need to delve into what ALJ Fritz did, or did not, find. There is no need for remand.

III.    Conclusion

The court's function is not to substitute its own judgment for that of the ALJ, but to determine whether the ALJ's decision is supported as a matter of fact and law. Based on the foregoing, the court finds that the Commissioner's decision is supported by substantial evidence and contains no reversible error. *See Craig,* 76 F.3d at 589; *see also* 42 U.S.C. § 405(g). Therefore, the Commissioner's decision is affirmed.

IT IS SO ORDERED.

August 29, 2022                                        Kaymani D. West
Florence, South Carolina                         United States Magistrate Judge